UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| INDIANA LABORERS PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | x : : : | Civil Action No. 08-cv-5994 |
|  | : : | CLASS ACTION |
| Plaintiff, | : : | COMPLAINT FOR VIOLATION OF FEDERAL SECURITIES LAWS |
| vs. | : : |  |
| FIMALAC, S.A., FITCH GROUP, INC., FITCH RATINGS, LTD., MARC LADREIT DE LACHARRIÈRE, STEPHEN W. JOYNT and JOHN SCHIAVETTA, | : : : : : : : |  |
| Defendants. | : : |  |
|  | x | DEMAND FOR JURY TRIAL |

## TABLE OF CONTENTS

**Page**

INTRODUCTION AND NATURE OF THE ACTION ...................................................1

JURISDICTION AND VENUE ...................................................................................2

THE PARTIES..............................................................................................................2

THE INDIVIDUAL DEFENDANTS' ACCESS TO CRITICAL INFORMATION......................3

CLASS ACTION ALLEGATIONS .............................................................................5

CONTEXT OF DEFENDANTS' FALSE AND MISLEADING STATEMENTS ......................7

    Background........................................................................................................7

    The Evolution of Mortgage Lending Practices Leads to Increased Use of
        Mortgage-Backed Securities..................................................................7

    The Subprime Mortgage Market.......................................................................9

    The Subprime and Alt-A Markets Converge ...................................................13

    Fraud and Risk on the Rise ..............................................................................17

    The Tidal Wave Crashes and Fitch Downgrades Thousands of RMBS and CDO
        Securitizations.......................................................................................18

DEFENDANTS' FALSE AND MISLEADING STATEMENTS DURING THE CLASS
    PERIOD ...........................................................................................................19

THE TRUTH BEGINS TO EMERGE ........................................................................22

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET
    DOCTRINE .....................................................................................................32

LOSS CAUSATION....................................................................................................32

NO SAFE HARBOR ...................................................................................................34

PRAYER FOR RELIEF ..............................................................................................39

JURY TRIAL DEMANDED........................................................................................40

1.      Plaintiff Indiana Laborers Pension Fund ("Plaintiff"), individually and on behalf of a proposed class (the "Class") of all U.S. citizens or residents who purchase the common stock of Fimalac, S.A. ("Fimalac") between July 26, 2006 and April 21, 2008, inclusive (the "Class Period"), by and through Plaintiff's undersigned counsel, brings suit against Fimalac, Marc Ladreit de Lacharrière ("Lacharrière"), Fitch Group, Inc. ("Fitch Group"), Fitch Ratings, Ltd. ("Fitch"), Stephen W. Joynt ("Joynt") and John Schiavetta ("Schiavetta") (collectively, "Defendants").

2.      Plaintiff seeks remedies under the Securities Exchange Act of 1934 (the "Exchange Act") as a result of the fraudulent scheme undertaken by the Defendants and the economic loss suffered when the true facts were partially revealed through a series of disclosure events to the public.  The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5.

### INTRODUCTION AND NATURE OF THE ACTION

3.      Fitch, a majority owned subsidiary of Fimalac, assigns credit ratings to structured finance transactions.  At the start of the Class Period, Fitch's core business practice of rating residential mortgage-backed securities ("RMBS") and collateralized debt obligation ("CDO") transactions was extremely profitable for Fitch, which enabled it to report strong growth, which, in turn, drove Fimalac's stock price to a Class Period high of €80.98 per share on May 22, 2007.

4.      Defendants failed to disclose to investors that: (i) the information upon which Fitch based its ratings of RMBS and CDOs was misleading and in many cases fraudulent; (ii) to continue to collect fees for its ratings, Fitch was applying lax standards or no standards at all when issuing its RMBS and CDO ratings; and (iii) Fitch was failing to monitor the credit quality of RMBS and CDOs after issuing its initial ratings – as Fitch was obligated to do – and many of these securities had deteriorated badly after Fitch had issued its ratings.

5.      Fitch is now under investigation by the New York Attorney General, the Connecticut Attorney General, the Ohio Attorney General and the Securities Exchange Commission ("SEC") as a result of its reckless practices of rating billions of dollars of securities without a reasonable basis for doing so and its stock is trading at approximately 50% of its Class Period high.  Innocent investors like plaintiff and Class members who purchased Fimalac stock during the Class Period were unaware of the misconduct in Fitch's rating process and have suffered massive losses as a result thereof.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1331.

7.      Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b).  In addition, the claims asserted herein occurred and/or accrued, among other places, in this District.  At all times relevant to this action, Fitch was headquartered in this District, and many of the acts and transactions alleged herein, occurred in substantial part in this District.

8.      In connection with the acts, conduct, and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

9.      Plaintiff Indiana Laborers Pension Fund purchased Fimalac common stock on the open market during the Class Period as set forth in the certification attached hereto.

10.    Defendant Fimalac is an international business support services group headquartered in Paris, France.  Its stock is traded on the Euronext Paris exchange, an efficient market, under the symbol "FIM."  Fimalac owns 80% of defendant Fitch Group.

11.    Defendant Lacharrière was Chairman of the Board and Chief Executive Officer ("CEO") of Fimalac during the relevant period.

12.    Defendant Fitch Group, which was formed in 2004, is the holding entity of financial service organizations Fitch and Algorithmics.  Fitch Group owns 100% of Fitch.

13.    Defendant Fitch maintains a headquarters in New York, operating offices and joint ventures in more than 49 locations and covering entities in more than 90 countries, including insurer financial strength ratings on over 2,000 insurance companies.  Fitch is a majority-owned subsidiary of defendant Fimalac, an international business support services group headquartered in Paris, France.

14.    Defendant Joynt was the President and CEO of Fitch during the relevant period.

15.    Defendant Schiavetta was a group managing director of Fitch during the relevant period until he left in early 2008.

**THE INDIVIDUAL DEFENDANTS' ACCESS TO CRITICAL INFORMATION**

16.    Lacharrière, Joynt and Schiavetta (collectively the "Individual Defendants") were privy to confidential and proprietary information concerning Fitch, its operations, finances, financial condition, and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning Fitch, as discussed in detail below.  Because of their positions, the Individual Defendants had access to non-public information about Fitch's business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports

- 3 -

and other information provided to them in connection therewith.  Because of their possession of such information, the Individual Defendants knew or were severely reckless in disregarding the fact that adverse facts specified herein had not been disclosed and were being concealed in order to mislead the investing public.

17.     Throughout the Class Period, the Individual Defendants were able to, and did, control the contents of Fitch's public statements.  The Individual Defendants were provided with copies of, reviewed and approved, and/or signed such filings, reports, releases, and other statements prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  The Individual Defendants were also able to, and did, directly or indirectly, control the conduct of Fitch's business and its public statements.  Moreover, the Individual Defendants made or directed the making of affirmative statements to the investing public, and participated in meetings, conference calls, and discussions concerning such statements.  Each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations that were being made were then false and misleading.  As a result, each of the Individual Defendants is responsible for the false and misleading statements detailed herein and is therefore responsible and liable for the representations contained therein.

18.     The Individual Defendants are liable as direct participants and co-conspirators with respect to the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors, were "controlling persons" within the meaning of §20 of the Exchange Act and had the power and influence to cause Fitch to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Fitch's business.

19.     The Individual Defendants, because of their positions with Fitch, controlled and/or possessed the authority to control the contents of its statements to the investing public. The Individual Defendants were provided with copies of the reports and press releases alleged herein to be misleading, prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

20.     The Individual Defendants are liable as primary participants in a fraudulent scheme and wrongful course of business which operated as a fraud or deceit on purchasers of Fimalac common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The fraudulent scheme employed by the Individual Defendants was a success, as it: (i) deceived the investing public regarding Fimalac's prospects and business; (ii) artificially inflated the price of Fimalac common stock; and (iii) caused Plaintiff and other members of the Class to purchase Fimalac common stock at inflated prices, which artificial inflation came out of the stock when the truth regarding the true financial condition of Fimalac was revealed.

## CLASS ACTION ALLEGATIONS

21.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all U.S. citizens or residents who purchased the common stock of Fimalac during the Class Period. Excluded from the Class are Defendants, the officers and directors of Fimalac, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

22.     Because Fimalac has millions of shares outstanding, and because Fimalac's shares were actively traded on the Paris Euronext exchange, members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members can only be

determined by appropriate discovery, Plaintiff believes that Class members number at least in the thousands and that they are geographically dispersed.

23.     Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained herein.

24.     Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in class actions and securities fraud litigation. Plaintiff has no interests that are contrary to or in conflict with the members of the Class Plaintiff seeks to represent.

25.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

26.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members, in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated federal securities laws as alleged herein;

(b)     whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)     whether Defendants breached any duty to convey material facts or to correct material acts previously disseminated;

(d)     whether Defendants participated in and pursued the fraudulent scheme or course of business complained of;

(e)     whether Defendants acted willfully, with knowledge or severe recklessness, in omitting and/or misrepresenting material facts;

(f)     whether the market price of Fimalac common stock during the Class Period was artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages as a result of the decline in value of Fimalac's stock when the truth was revealed and the artificial inflation came out and, if so, what is the appropriate measure of damages.

## CONTEXT OF DEFENDANTS' FALSE AND MISLEADING STATEMENTS

**Background**

27.     Prior to and throughout the Class Period, Fitch was heavily involved in rating structured finance transactions made up of RMBS and CDOs, including billions of dollars of subprime securities.   The revenue associated with Fitch's structured finance ratings was a tremendous source of Fitch's growth during the Class Period, and was also a primary driver of Fimalac's stock price.

**The Evolution of Mortgage Lending Practices Leads
to Increased Use of Mortgage-Backed Securities**

28.     Prior to 1980, the mortgage market was dominated by savings and loan associations that originated conventional mortgage loans, mortgage bankers that originated government mortgage loans, and mortgage brokers that handled everything else.   Changes enacted by the Depository

Institutions Deregulation and Monetary Act of 1980 reduced the lending advantage that savings and loans had enjoyed, and allowed the mortgage market to shift toward federal banks and federal government sponsored enterprises ("GSEs"). GSEs played a key role in the development of mortgage-backed securities.

29.    The Alternative Mortgage Transaction Parity Act of 1982 authorized state-chartered lending institutions to offer alternative mortgage products, including those with variable interest rates and balloon payments, and has been credited with increasing parity among state and federally chartered mortgage banks. The Tax Reform Act of 1986 stimulated mortgage demand by retaining the federal income tax deduction for mortgage interest and eliminating similar deductions for consumer debt like car loans and educational loans. These legislative changes, together with the increased popularity of mortgage-backed securities, encouraged and facilitated product innovation and expanded credit availability during the 1980s.

30.    Prior to the mid-1990s, most lenders required potential homeowners to put 20% down on their new home loans. People with damaged credit, employees with non-wage income, and young people with few savings for down payments were largely shut out of the housing market. As the millennium approached, however, the mortgage lending market changed dramatically, and credit became much more widely available.

31.    The increasing popularity of the Internet and advances in computing technology made it easier and cheaper to process and package new loans. Electronic databases made it easier for lenders to rapidly attempt to assess the risk of lending to borrowers with damaged credit, and the secondary market for mortgage-backed securities helped lenders package riskier loans with less risky ones to theoretically mitigate an investor's risk exposure. Strong interest in mortgage-backed securities from investors in the United States and abroad gave lenders a great incentive to lend – they

were able to rapidly resell their loans on the secondary market, making a profit, and unload the risk of payment default to others.

32.    These changes had dramatic consequences for home ownership.  According to a recent study by the Federal Reserve Bank of Chicago, subprime lending put as many as two million families into homes over the past decade, helping to meaningfully increase the rate of home ownership in the United States.  Although subprime lending alone did not cause this change, it accounted for close to half of the rise in the home ownership rate and is believed to have had almost as much of an impact on rising home ownership as demographic changes, low interest rates, and government programs combined.  Former Federal Reserve Chairman Alan Greenspan has referred to subprime lending as "the democratization of credit."

33.    Changes over the past decade not only helped subprime homebuyers enter the market, but also first-time homebuyers.  In 2006, 45% of first-time homebuyers purchased their homes with no money down, up from nearly zero percent ten years before.

34.    At about the same time that credit became more readily available, housing prices were increasing, and doing so dramatically in certain areas, such as California and Florida. Homebuyers seeking to purchase increasingly expensive homes were gravitating toward mortgages with low introductory interest rates and other features that put previously unaffordable homes within their grasp.  Nontraditional mortgages became the norm.  Nationwide, nontraditional loans comprised over one-third of all loans made during the first nine months of 2006, up 1,600% from 2000.

**The Subprime Mortgage Market**

35.    The residential mortgage industry provides financing to consumers to purchase homes, refinance the rate and term of a previous loan or loans, and to refinance mortgage loans for the purpose of extracting cash from the value of the subject property.  There are numerous types and

permutations of mortgage loan products in the market place today. Mortgage loans primarily differ based on if a loan rate is fixed, payment options, maturity date, amortization of principal, and maturity date. In addition, lending is divided up into 1st lien and 2nd lien loans. A key driver for the industry is based upon how borrowers are categorized with respect to a financing transaction. This breaks down into primarily three major categories: prime borrowers, Alt-A borrowers, and subprime borrowers.

36.    Subprime mortgage loans are issued to borrowers who do not qualify under conventional credit criteria. Typically this means borrowers with low credit scores or deficient credit scores. The credit scores, FICO being a popular score used in the market, are based on the borrowers past payment patterns and the amount of credit available to the borrower. A subprime borrower will pay a higher interest rate commensurate with higher credit risk.

37.    Prior to the mid-1990s, subprime borrowers typically could not borrower more than 65% of the value of their home. This maximum loan to value ratio, however, began to be increased as house price appreciation began to increase.

38.    The securitization market for residential mortgages can be divided up into transactions based on prime credit borrowers, Alt-A borrowers and subprime borrowers. Mortgage loans are securitized in order to gain off-balance-sheet treatment for originators. There is little or no regulation for the securitization transaction itself. The criterion for the credit exposure for any bond is primarily based upon rating agencies such as Fimalac's Fitch unit.

39.    Over two-thirds of all mortgages are securitized – bundled together and sold in groups on the secondary market. The loan bundles, commonly known as residential RMBS, CDOs or collateralized loan obligations ("CLOs"), are widely seen as a way to spread credit risk to investors. Monthly payments on the mortgages are used to pay the interest on the mortgage-backed bonds.

40.     U.S. CDOs were extremely vulnerable to ratings volatility and represented a pooling of the lowest-rated subprime securities or swaps tied to subprime securities. The CDOs represented extremely leveraged securities that were used to support the funding of subprime and Alt-A securitizations. Without the CDO structure, there were no buyers for the lower rated subprime securitization securities, so CDO securities were structured and sold as a high yielding asset in a low yield environment and derived from residential mortgage securities. It was not disclosed that a majority of the securities were subprime securities or reference portfolios related to subprime securities.

41.     CDOs give issuers the ability to sell off all credit risk or purchase protection for/hedge a portfolio of subprime securities that could not otherwise be sold.

42.     CDO structures represented transactions that investors typically did not understand or have the correct detail available to make fully informed decisions regarding the probability of default. Fitch and the issuers, on the other hand, reviewed or had access to complete data to determine the probability of default and the volatility of such ratings.

43.     Some CDOs are purchased by private firms, while others are purchased by Fannie Mae and Freddie Mac, the two GSEs. The importance of CDOs within the U.S. economy cannot be overstated. As of June 30, 2006, mortgage-backed securities accounted for the largest segment of the U.S. bond market (23% of all outstanding bond market debt, compared to corporate bonds at 20% and Treasury debt at 16%).

44.     According to the Mortgage Bankers Association, $1.2 trillion of privately issued RMBS were issued in 2006. An additional $966 million worth of RMBS were issued by the GSEs. Nonprime loans comprised two-thirds of private CDOs in 2005, up by more than 35% from just 46% in 2003.

45.     The growth of nontraditional mortgages has changed the market for securities.  As the nonprime market has grown, so has the popularity of private-label mortgage-backed securities (*i.e.*, those securitized by entities other than the GSEs).  Total outstanding private-label CDOs represented 29% of all CDOs in 2005, more than double its share in 2003.  At the same time, the share of CDOs held by the GSEs fell by 10%, from 53% to 43%.  The shift is a dramatic reflection of investor choice.  Investors left the guaranteed GSE-backed mortgage market for higher interest rates in the potentially riskier, privately backed mortgage securities market.  As they did so, the amount of capital available to fund nontraditional mortgages grew, making more of these mortgages available to more borrowers.

46.     Most asset-backed securities are priced in relation to the London Interbank offered rate, or Libor.  High-quality debt issues are priced to yield Libor or a few hundredths of a percentage point above it.  Traditionally, lower-quality debt has been priced one or two percentage points higher than Libor.  Demand has been high for lower quality debt securities, which typically offer higher yields than many other bonds.  Demand for these securities has also encouraged several Wall Street investment firms, including Morgan Stanley, Merrill Lynch and Bear Stearns, to purchase subprime lenders.  Using sophisticated methods, these Wall Street firms figured out how to profit on the difference between Libor and the price of high yielding CDOs.

47.     The downside to the lucrative profit potential offered by mortgage-backed securities occurs when loans fail to perform (*i.e.*, become delinquent).  When a lender sells a bundle of mortgages on the secondary market, the lender commonly agrees to buy back loans that fail to perform.  If a large enough percentage of a lender's loans become non-performing, as has increasingly been the case, the lender will lack sufficient cash with which to buy back the loans, and will be forced to shut its doors.  For example, Ownit Mortgage Solutions of Agoura Hills, California,

which had billed itself as one of the top 15 lenders to homebuyers with weak or no credit histories, shut its doors in December 2006, when it ran out of cash needed to buy back its nonperforming loans from investment banks and others who purchased the loans on the secondary market.  Sebring Capital Partners out of Carrollton, Texas, another subprime lender that ran out of cash to buy back nonperforming loans, folded the same week.

48.     Data on Alt-A mortgages that have been packaged up and sold as mortgage-backed securities show the growing popularity of low-documentation and stated-income loans.  More than 80% of Alt-A mortgages that were securitized in 2006 were low-documentation, stated-income loans, according to *Inside Mortgage Finance*.  That number was up from 68% in 2005.  At its peak, 30% to 40% of all residential mortgage securitization transactions were either Alt-A or subprime related.

**The Subprime and Alt-A Markets Converge**

49.     In an effort to meet the needs of borrowers who could not fully document their income, employment, or assets, a new mortgage lending segment was started in the 1990s called "Alt-A."  Typically, these borrowers were self employed and had good cash flow, but could not document their income via tax returns, W-2s and pay stubs.  The typical Alt-A borrower had a higher FICO score and a good credit history.

50.     After 2003, however, Alt-A lending rapidly evolved into loans that had very little borrower information or had stated income and stated assets.  In other words, information in the mortgage loan application (such as income and assets) was not typically verified by the lender, next to nothing was actually known about the borrower and lenders were reliant only upon the borrowers' credit scores and the adequacy of the underlying collateral, not the primary source of repayment – the borrower's income.  Stated loans were ones where borrowers simply stated their assets and

income: "You're a schoolteacher and you make a half million a year? OK. Your assets are $5 million? Fine." These no-documentation loans simply become "liar loans."

51. This type of aggressive lending and poor underwriting fostered the rise of mortgage brokers and lenders steering borrowers to stated, low or "no doc" loans for convenience and fraud purposes.

52. Prior to and during the Class Period, more and more borrowers took advantage of the ability to qualify for a loan while providing little or no documentation. The more housing prices rose, the more popular Alt-A loans became. Put simply, "[t]he most creative mortgage products came out of the Alt-A business," said Manuel Ramirez, an analyst with Keefe Bruyette & Woods in San Francisco.

53. When buyers realized they could not afford the home they wanted, they took out alternative mortgages that helped them pay the higher price. Subprime and Alt-A mortgages requiring few documents – the stated income or "NINJA" loans (meaning No Income, No Job, No Assets) – allowed buyers to inflate their earnings and get bigger loans that they should never have qualified for. Moreover, most mortgage originators routinely offered Alt-A as well as prime and subprime loans, according to a survey by Campbell Communications, a research firm in Washington, D.C. The Campbell study points to a significant convergence of the Alt-A, prime and subprime broker communities: nearly three-quarters of the brokers surveyed reported that they regularly originated all three types of mortgages, and very few appeared to concentrate on just one major type of product.

54. For example, during 2006, 20% of home purchase loans were Alt-A, up 300% from 5% in 2002, according to a March 12, 2007 report by Credit Suisse. The report stated that lenders took too many risks with Alt-A loans during 2006. For example:

- On average they loaned 88% of the value of a home, with 55% of homebuyers taking out a simultaneous second mortgage, suggesting such borrowers did not pay mortgage insurance and borrowed the full value of the home.

- Low or no documentation loans represented 81% of all Alt-A purchase loans in 2006, up from 64% in 2004.

- Loans with a one-year fixed "teaser" rate accounted for 28% of Alt-A purchase loans last year, "setting the stage for considerable reset risk" when the teaser period ends.

55.    Put simply, the popularity of subprime and Alt-A mortgages exploded. A record $400 billion of Alt-A loans were originated in 2006 – 13.4% of all mortgages offered in 2006, according to industry publisher *Inside Mortgage Finance*.

56.    But, as the Alt-A business grew, more of these loans were offered to less creditworthy borrowers, creating what mortgage industry insiders called "Alt-B" products. The result was that the difference between Alt-A and subprime loans was virtually eliminated because Alt-A products were weighted with subprime deficiencies.

57.    For example, in 2004, Fitch announced it had determined that material differences existed among Alt-A residential mortgage-backed securities due to a lack of uniform standards. This vacuum led to real differences in Alt-A originations, leaving many Alt-A securitizations to bear "unprotected credit risks because of the implications from borrower credit, risk layering and intangibles." Fitch further explained that the booming Alt-A market, which was created to offer alternative processes for borrowers who could not comply with conforming or nonconforming program guidelines, evolved as new entrants and existing lenders expanded their product bases. "As lenders have embraced a wider credit spectrum under the Alt-A banner, there is such a blurring of the original definition of Alt-A, that the term should hold little meaning to investors," the report's co-author Cheryl Glory said in the announcement.

58.    By 2005, there was also an emphasis on processing and reduction of costs through technology for the mortgage loan origination process. The use of technology dramatically reduced

the time needed to originate new mortgage loans.  In addition, the use of technology for automated underwriting ended up taking out significant verification steps in order to speed up the approval process.  High levels of automated underwriting allowed for loans to be processed without a "common sense" factor being applied or fraud prevention.  Therefore, borrowers and brokers came to understand the automated underwriting model for lenders and work around it to provide either: (a) false information that could not be detected; or (b) move borrowers into programs that would require fewer details for the approval process.  This trend was well known to rating agencies such as Fitch.

59.    The result was that Alt-A and Alt-B pools had riskier loan characteristics than the Alt-A of the not-so-distant past, and "combined with expanded origination guidelines and weaker underwriting practices" there was substantial credit risk.  Fitch's Group Managing Director stated that "As we see from this research, default risk is magnified in certain collateral pools given less rigorous origination practices and multiple risk layers. . . .  [W]hile the credit support provided to investors in Alt-A- and Alt-B deals is greater than those of Prime Alt-A, Fitch generally feels it is insufficient to compensate for the increased risks investors face."

60.    Data from *Loan Performance* tells a similar story: 58% of all mortgages originated in the fourth quarter of 2006 were low-documentation loans.  That was up from 21% at the start of 2000.  In California, which saw some of the biggest gains in home prices this decade, 86% of all mortgages offered in the fourth quarter of 2006 were low-documentation loans.  That was up from 29% in early 2000, *Loan Performance* data shows.  In other words, precious little was actually known about borrowers.

61.    During the Class Period, stated income loans at high loan-to-value ratios were a major source of abuse by lenders and brokers.  A key trend was for the broker-dealers securitizing

mortgage loans to only underwrite a sample of the loans being purchased with little to no borrower data. Such representations were of little to no value.

62.     Put simply, because of the increasing use of NINJA loans and similar products, Fitch was aware the information underlying the mortgages that made up subprime and Alt-A RMBS and CDO transactions was unreliable. The importance of this fact cannot be overstated, because Fitch's models for rating RMBS and CDO loans were only as reliable as the information underlying them.

**Fraud and Risk on the Rise**

63.     Although they have only recently grown to comprise a significant portion of the mortgage market, nontraditional mortgage loans have been available for many years. In the past, nontraditional mortgage loans were offered only to higher income borrowers, those with promising long-term earnings potential, such as young lawyers and doctors just finishing law and medical school, and to borrowers with uneven income streams, such as stock brokers or salespeople who receive large commission checks one or more times a year. As set forth above, however, in the past several years, nontraditional loans have increasingly been used to help home buyers, especially those considered subprime borrowers, obtain credit.

64.     As the subprime RMBS and CDO markets further deteriorated during 2006 and 2007, Fitch continuously misled the market that its modeling and surveillance were adequate to monitor the performance of structured finance transactions, and touted Fitch's ability to quickly move to a "fast-changing" environment through surveillance.

65.     But Defendants had conflicting incentives when it came to rating and surveillance of securitization transactions. ***Fitch was paid by issuers and the revenue from issuers far surpassed revenue from investor subscriptions***. At the same time, there was very little revenue associated with surveillance, which could not be completed on a timely basis, as set forth above. Moreover, it was to the benefit of Fitch to allow RMBS and CDO issuance to continue as long as possible and forestall

the collapse in revenues associated therewith.  In simple terms, defendants knew that if Fitch downgraded its previously issued ratings on securitization products, it would lose business.

66.    Because Fitch was seriously delinquent in its surveillance, *ratings were being maintained on billions of dollars worth of subprime and Alt-A RMBS and CDOs despite defendants' awareness of their impaired status and without any formal review*.  This allowed securitization transactions to deteriorate horribly and Fitch to ignore the level of defaulted loans and subsequent losses, while its ratings remained stagnant.

67.    Because of Fitch's failure to conduct adequate surveillance on a timely basis and/or refusal to incorporate the results, its inability to account for fraud in its models, and its conflicts of interest, its ratings changes for structured finance transactions during the Class Period ended up being delayed and extreme.  To be clear, however, this case is not based upon Fitch's failure to monitor its rated RMBS and CDOs, nor is it based upon Fitch's failed ratings models.  Instead, it is based upon Defendants' misrepresentations regarding how Fitch conducted business – misrepresentations with vast implications for Fitch's true financial condition and prospects.

**The Tidal Wave Crashes and Fitch Downgrades**
**Thousands of RMBS and CDO Securitizations**

68.    Delinquencies related to subprime and Alt-A mortgage loans began to spike in August of 2006 and reached historical highs by the end of November 2006.  Subprime loans 60 days or more delinquent represented more than 30% of the pool balance for 2006 securitizations.  Loans underlying RMBS and CDO transactions were defaulting immediately after origination and staying delinquent.  This same pattern emerged for Alt-A mortgage loans, but with smaller percentages than subprime mortgage loans.

69.    Although the subprime RMBS and CDO market was under intense pressure and collapsing, Fitch did not begin downgrading structured finance transactions until August 1, 2007.

As set forth below, over the span of several months, Fitch downgraded billions of dollars worth of RMBS and CDO securities:

- August 1, 2007 – Fitch downgrades $2.4 billion in RMBS

- August 16, 2007 – Fitch downgrades $13 billion in RMBS

- October 30, 2007 – Fitch downgrades $23 billion in CDOs

- November 13, 2007 – Fitch downgrades $37.2 billion in CDOs

- November 22, 2007 – Fitch downgrades $29.8 billion in CDOs

- December 26, 2007 – Fitch downgrades $3 billion in RMBS

- February 5, 2008 – Fitch downgrades $220 billion in CDOs

- February 19, 2008 – Fitch downgrades $17 billion in RMBS

- February 21, 2008 – Fitch downgrades $7 billion in RMBS

- March 5, 2008 – Fitch downgrades $14 billion in RMBS

**DEFENDANTS' FALSE AND MISLEADING STATEMENTS
DURING THE CLASS PERIOD**

70.     Throughout the Class Period, Fitch issued hundreds of releases announcing the ratings for various securities.  For example, on July 26, 2006 – the first day of the Class Period – Fitch issued a release rating over $1.3 billion of RMBS issued by Long Beach Securities Corporation.  That release, like all such releases during the Class Period, incorporated by reference information contained on Fitch's website, as follows:

> Fitch's rating definitions and the terms of use of such ratings are available on the agency's public site, "www.fitchratings.com."  Published ratings, criteria and methodologies are available from this site, at all times.  Fitch's code of conduct, confidentiality, conflicts of interest, affiliate firewall, compliance and other relevant policies and procedures are also available from the "Code of Conduct" section of this site.

71.     The Code of Conduct on Fitch's website since April 2005 and incorporated by reference into hundreds of releases during the Class Period said the following, *inter alia*:

- 19 -

The rating analysis and any rating action shall be based upon Fitch's established criteria and methodologies, applied consistently, and shall be influenced only by factors relevant to such rating analysis and rating action.

\*       \*       \*

Fitch shall not forbear or refrain from taking any rating action based on the potential effect (economic, political, or otherwise) of the rating action on Fitch, issuers, investors or other market participants.

\*       \*       \*

All employees must use special care to avoid even the appearance of a conflict. An appearance of a conflict arises when a reasonable investor or issuer could believe that other interests, responsibilities or duties of the employee give rise to bias even if the employee believes that he or she can make an unbiased decision.

\*       \*       \*

Fitch shall structure all reporting lines for Fitch employees to eliminate or effectively manage actual and potential conflicts of interest.

\*       \*       \*

Fitch shall make every effort to manage the potential conflict arising from the payment of fees by issuers and ensure that Fitch's receipt of fees from issuers does not impair the independence, objectivity or integrity of its ratings and rating actions.

72.    On March 22, 2007, *The Wall Street Journal* reported:

The meltdown in mortgages for risky, "subprime" borrowers is claiming its latest casualties: credit-ratings companies.

Trading in many bonds backed by subprime mortgages reveals a widening gap between investors' perception of their risk and the opinions of large ratings providers like Moody's Investors Service, Standard & Poor's and Fitch Ratings. Some subprime-mortgage bonds that were assigned investment-grade ratings as recently as 2006 are even trading at prices that imply they could be as risky as junk bonds. Yet most of their ratings haven't changed.

\*       \*       \*

The ratings providers "were at least as interested as the investment banks in getting the deals done because they would get paid for rating them," notes Edward Grebeck, chief executive of Tempus Advisors, a debt-markets strategist in Stamford, Conn.

*Executives at ratings companies deny a conflict exists. "Issuers pay us because investors believe our opinions about the risk of the assets have value," says Glenn Costello, a managing director at Fitch. He adds that "it is still too early to determine which bonds are going to be most at risk*."

73.    The above statements were false and misleading because Fitch was unwilling to accurately apply its rating standards because the issuers who paid Fitch's fees required AAA-rated tranches to continue selling CDOs and RMBS.  As such, Fitch applied much less stringent criteria to CDOs and RMBS because they were exponentially more lucrative than the fees from corporate bonds and continuing to artificially inflate high ratings was necessary to perpetuate Fitch's fees going forward.  Indeed, Fitch has since downgraded CDOs and RMBS at a much higher rate than corporate bonds for this very reason.

74.    The Code of Conduct on Fitch's website since April 2005 and incorporated by reference into hundreds of press releases during the Class Period also said the following:

> The rating analysis and rating decisions shall be based on a thorough analysis of all information known to Fitch and believed by Fitch to be relevant to such analysis and rating decision . . . .

75.    This statement was false and misleading because Fitch was aware that much of the information it relied upon in rating RMBS and CDOs was inaccurate.  Although Fitch was not required to audit the information provided by issuers, its Code of Conduct required it to include in its analysis the relevant information known to Fitch.

76.    The Code of Conduct on Fitch's website since April 2005 and incorporated by reference into hundreds of press releases during the Class Period also said the following:

> Neither Fitch nor its employees shall, either implicitly or explicitly, give any assurance or guarantee of a particular rating prior to the final rating decision being taken in accordance with Fitch's established policies and procedures.  Nothing herein shall preclude Fitch from continuing to provide rating assessments and credit assessments – that is, an assessment of  creditworthiness that does not constitute a rating in that the full rating process is not applied, and the analysis is based on hypothetical scenarios and/or limited information.

- 21 -

77. The above statement was false and misleading because, as has now become apparent, Fitch analysts worked with issuers to structure CDOs and RMBS in order to achieve the necessary ratings. Far from an impartial arbiter of creditworthiness, Fitch's role was akin to an underwriter, in that it was intimately involved in the creation of the securities at issue, not just evaluating them afterward.

78. The Code of Conduct on Fitch's website since April 2005 and incorporated by reference into hundreds of press releases during the Class Period also said the following:

> Except for point-in-time ratings that Fitch clearly identifies as such, Fitch shall provide ongoing surveillance for all public ratings.

> In accordance with Fitch's established policies and procedures on surveillance, Fitch shall review ratings regularly . . . .  Fitch shall also initiate a ratings review if it becomes aware of any information that it believes might reasonably be expected to result in a rating action, consistent with the relevant criteria and methodologies.

79. The above statement was false and misleading when made because, rather than monitoring the securities as they represented, which generated no fees, Fitch focused almost exclusively on the fee-generating business of rating new securities. Fitch neglected its duty to monitor each security it rated individually, as demonstrated by its decision to downgrade tens and hundreds of billions of dollars of CDOs at a time.

## THE TRUTH BEGINS TO EMERGE

80. On August 16, 2007, investors were shocked when the *Associated Press* published an article entitled "EU to Examine Credit Rating Agencies," which reported that "the European Union will examine why credit rating agencies were slow to react to early signs of U.S. loan defaults that are now worrying investors worldwide."  The *Associated Press* article stated in relevant part:

> EU to look at why credit rating agencies were slow to downgrade subprime losses

The European Union will examine why credit rating agencies were slow to react to early signs of U.S. loan defaults that are now worrying investors worldwide, EU officials said Thursday.

The inquiry will look specifically at whether there were conflicts of interest, they said.

*Credit rating agencies such as Standard & Poor's Corp., Moody's Investors Service Inc. and Fitch Ratings are paid by the banks that they rate for credit-worthiness*.

A senior EU official, who spoke on a condition he not be quoted by name because of the sensitivity of the issue, said the EU needed to look at possibly strengthening its code of conduct and whether other measures would be appropriate.

He said there was a "very significant delay" between banks reporting a sharp climb in poor returns from U.S. subprime housing loans made to people with poor credit and the agencies putting banks on credit watch.

Agencies continued to support debt trading at a discount after banks' first quarter results this spring showed a growing number of mortgage defaults, he said.

In the United States, Rep. Barney Frank, chairman of the House Financial Services Committee, in a recent interview promised a "serious inquiry" this fall into the ratings agencies, which have been criticized for not properly evaluating the risks of bonds backed by mortgages given to borrowers with weak credit.

EU spokeswoman Antonia Mochan confirmed that the European Commission and its high-level advisory group on financial services, the Committee of European Securities Regulators, would be looking at how credit rating agencies assess structured products, investments that derive their value from real assets and are used to spread risk.

Mochan said the EU's executive arm would look at the governance of these agencies, their management of conflict of interests and their ratings performance.

In addition, CESR will in parallel report on the agencies next April.  A code of conduct drawn up by the International Organization of Securities Commissions was also under review, she said.

"We have a general eye on market developments including regulatory supervision and hedge funds," Mochan said.  "We are following the situation and will draw any lessons that need to be drawn from what we see over the last weeks and in the coming days and weeks."

Moody's spokesman Anthony Mirenda said the agency, "is committed to continuing the constructive dialogue that we've had with regulators and policymakers to enhance the overall understanding of the structured financial market,

- 23 -

the various players in that sector and the role of ratings and rating agencies in the market."

A spokesman for S&P, part of McGraw-Hill Cos., declined to comment other than to say that S&P is participating in the European review. A Fitch spokesman, James Jockle, said that Fitch has not yet been contacted by the EU but "would be happy to answer whatever questions they may have about our business."

The worsening credit situation prompted French President Nicolas Sarkozy to urge the Group of Seven industrial countries to better monitor international financial markets. In a letter to German Chancellor Angela Merkel, he called for an investigation of the role of credit agencies in identifying risks.

Sarkozy has repeatedly sought a greater role for governments in managing the economy – and has sought to wrest some control of monetary policy from European Central Bank regulators.

81.    Investors were shocked by this news, and reacted negatively, causing the price of Fimalac shares to fall from €59.12 to €54.40 per share – 8% – in a single trading day as artificial inflation came out of the stock price.

82.    The decline in Fimalac's stock price was described in a *Reuters* article published on August 16, 2007, which stated:

Rating agency shares fall on report of EU review

. . . Rating agencies' shares were falling on Thursday after a European Union executive announced a review of the code used by the raters, a probe that could be critical of the industry.

EU Internal Market Commissioner Charlie McCreevy said that the crisis in the U.S. subprime mortgage sector has highlighted apparent failings in the voluntary code now used by the raters.

The three largest U.S. raters are Moody's Corp.; Standard & Poor's, a unit of McGraw-Hill Cos.; and Fitch, a unit of France's Fimalac.

*       *       *

Fimalac shares fell 8 percent in Paris to 54.40 euros.

"There's likely to be a headline risk in this story," said Neil Godsey, and analyst with Friedman, Billings, Ramsey & Co. "And it will stay that way until the subprime turmoil subsides."

- 24 -

After the collapse of energy trader Enron Corp. in 2001, the global market regulators came out with a voluntary code. This was targeted at what they saw as conflicts of interest in the sector, whereby rating agencies are paid by the firms they rate.

"The Commission is going to be looking at the issue of credit ratings agencies, particularly as they relate to rating of structured products," Commission spokeswoman Antonia Mochan told a regular news briefing.

In Brussels, Mochan said the Commission would look at a number of issues – governance of the agencies, their management of conflicts of interest, resourcing and ratings performance.

She said the Commission would focus on "the concerns we have in regard to their apparent slowness in responding to material market evidence of deterioration since 2006."

Mochan said the review would take at least until April 2008, but analysts said scapegoats were being hunted for the subprime fallout.

"THE BLAME GAME"

"The blame game has already started, with a growing criticism of the rating agencies," Citigroup economist Richard Reid said.

McCreevy will meet next month with the chairman of the Committee of European Securities Regulators (CESR), which groups the EU's 27 national market watchdogs, to discuss the issue.

Moody's spokesman Anthony Mirenda said his company would not comment on its stock price but was "committed to constructive dialogue with regulators and policymakers."

S&P said it was already participating in the CESR's review of how the industry complied with the code.

James Jockle, a managing director of Fitch, said his company had not been contacted by the EU regarding the review but would be happy to participate. "We talk frequently to world regulators," he said.

83.    On September 7, 2007, *The Wall Street Journal* reported that the SEC and State

Attorneys General of New York and Ohio were investigating and subpoenaing Fitch. The article

stated in part:

Ratings Firms' Practices Get Rated – SEC Probes if Conflicts Fueled Subprime Troubles

In the wake of mortgage-market turmoil, regulators plan to probe how the big credit-rating companies are paid and whether they are independent enough of the Wall Street firms that issue bonds.

The Securities and Exchange Commission and state attorneys general in New York and Ohio have begun to examine how the ratings firms evaluated subprime-mortgage-backed securities that grew into a trillion-dollar market. The ratings firms include McGraw-Hill Cos.' Standard & Poor's; the Moody's Investors Service unit of Moody's Corp., whose stock has soared in recent years; and Fitch Ratings, a unit of Fimalac SA of Paris.

Wall Street bankers churned out profits in recent years by bundling mortgages into securities and selling them to investors. Ratings firms played an important role because they gave investment-grade ratings to many of those securities, making it easier for Wall Street firms to sell the bonds.

Hundreds of those securities have since been downgraded by the ratings companies.

Though that is a small portion of all the securities graded by the ratings firms, the reversal contributed to a rout in credit markets last month and has sparked criticism of the ratings firms.

\*        \*        \*

In New York state, Attorney General Andrew Cuomo has subpoenaed documents from S&P and Fitch as part of a broader probe into the mortgage market. In Ohio, Attorney General Marc Dann is looking into the ways that rating firms interacted with Wall Street underwriters. "The more we look at it, the more we realize that these firms are important," said Mr. Dann.

84.    In response to this disclosure, artificial inflation was removed from Fimalac's stock

price, which declined from €52.38 go €50.35 in a single trading day.

85.    Also on September 7, 2007, *Reuters* reported that more states were joining in the

probe of Fitch and the other ratings agencies:

Half a dozen states are working together to investigate rating agencies, banks and other players that benefited from the onetime boom in subprime mortgages that has since turned into a meltdown, Ohio Attorney General Marc Dann told Reuters.

Cooperating with Ohio, states including Massachusetts, Illinois and New York, as well as the District of Columbia, are gathering data to determine if agencies are independent enough from Wall Street banks that issue mortgage bonds and other securities, he said.

- 26 -

Dann also stressed that the investigation focuses on all the firms that participated in the booming market for mortgage securities: mortgage brokers, appraisers, wholesale and retail lenders, investment banks, law firms and accounting firms.

"Everybody knows they don't get paid until the transaction gets a triple-A rating," said Dann, who has been looking into rating agencies since July.

"The system clearly is broken, and the poster child for that breakdown is the securitization of fraudulently obtained mortgages now known as subprime bonds," Dann said in a brief interview Friday. "Something has to be done about it."

A spokesman for Massachusetts Secretary of the Commonwealth William Galvin confirmed the office is looking into subprime market issues.

New York Attorney General spokesman Jeffrey Lerner declined to comment on the credit agencies probe. "We have not commented on the ongoing investigation."

\*        \*        \*

Dann in recent months has been among the most vocal critics of the mortgage securities industry. He argues that agencies such as the Moody's Investors Service unit of Moody's and Standard & Poor's, part of McGraw-Hill Cos., had an incentive to work with underwriters and ultimately grant high ratings to securities packaged by Wall Street banks.

Those ratings in several cases were downgraded after subprime loans went sour, leading to losses in related securities. The rating cuts sparked a wider panic in debt markets that has triggered losses for investors and a credit crunch more broadly.

Thousands of Ohio homeowners now face default and state pension funds suffered losses on mortgage bonds that were supposed to be as safe as Treasuries, Dann said.

On Wednesday, the Securities and Exchange Commission said it had begun a probe into the role of rating agencies in the mortgage market. The review, an SEC official told a Congressional hearing, looks at advisory services provided by agencies to underwriters and to lenders, the potential for conflicts of interest, disclosures and the performance of credit ratings after issuance.

86.     On November 28, 2007, Fitch issued a press release entitled "Fitch: Underwriting &

Fraud Significant Drivers of Subprime Defaults; New Originator Reviews," which stated in part:

Recent vintage residential mortgage-backed securities (RMBS), backed by pools of subprime mortgages continue to substantially under-perform initial expectations, which has resulted in significant ratings downgrades and heightened

risk of losses to principal. Fitch's analysis of subprime defaults suggests that lax underwriting and fraud may account for as much as one-quarter of the underperformance of the 2006 vintage of Subprime RMBS transactions. Fitch will be utilizing the insights from its research to improve its RMBS rating process.

The very high delinquency and default performance of recent vintage subprime RMBS has a variety of causes, including declining home prices and the prevalence of high-risk mortgage products such as stated-income loans and 100% combined-loan-to-value loans. Fitch has commented extensively on these drivers of mortgage default, most recently in the special report 'Drivers of 2006 Subprime Vintage Performance', dated Nov. 13, 2007. However as noted in the report, these factors do not fully account for the large number of early defaults that are occurring. Many industry observers have noted that poor underwriting, together with borrower/broker fraud, also appear to be playing a role in high defaults.

While some degree of early defaults are to be expected in subprime mortgage pools, the extraordinarily high level of defaults encountered by the 2006 vintage cannot be explained by home price declines alone. It has become increasingly evident that loans originated with lax underwriting and higher instances of fraud can have a material impact on a securitization. In order to better understand the unexpected high level of early defaults in subprime RMBS, Fitch analyzed a small sample of early defaults from 2006 Fitch-rated subprime RMBS.

Fitch's findings from this review include:

– Apparent fraud in the form of occupancy misrepresentation;

– Poor or lack of underwriting relating to suspicious items on credit reports;

– Incorrect calculation of debt-to-income ratios;

– Poor underwriting of 'stated' income loans for reasonability;

– Substantial numbers of first-time homebuyers with questionable credit/income.

\*          \*          \*

In light of its research, Fitch believes that it is important to reassess the risk management processes of originators, conduits and/or issuers for product being securitized going forward. Beginning in January 2008, Fitch U.S. RMBS rating process will incorporate a more extensive review of mortgage origination/acquisition practices, including a review of originator/conduit/issuer due diligence reports, and a sample of mortgage origination files. Additionally, Fitch is studying how a more robust system of representation and warranty repurchases could help to provide more stable RMBS performance.

- 28 -

Fitch will conduct enhanced originator/issuer reviews for all subprime transactions. Fitch will not rate subprime RMBS without completion of the review process. Fitch also intends to conduct enhanced reviews for Alt-A RMBS; however, these will be phased-in based on Fitch's view of the risk of particular Alt-A programs. High-risk programs include Pay-Option Arms and programs exhibiting substantial risk-layering. Such programs will be high priority for review.

87. As a result of these disclosures, Fimalac's stock price fell 3% in one trading day as artificial inflation came out of the stock price.

88. On April 22, 2008, defendant Joynt testified before the Senate Committee on Banking, Housing and Urban Affairs and admitted:

Like all of the major rating agencies, our structured finance ratings have not performed well and have been too volatile. We have downgraded large numbers of structured finance securities, particularly in the subprime mortgage and CDO areas, in many cases by multiple rating notches. While we still expect almost all AAA securities to pay off, we have downgraded many, and some previously highly rated securities are at a high risk of incurring losses in the future.

While we were aware of, and accounted for, the many risks posed by subprime mortgages and the rapidly changing underwriting environment in the U.S. housing market, we did not foresee the magnitude or velocity of the decline in the U.S. housing market nor the dramatic shift in borrower behavior brought on by the changing practices in the market. We also did not foresee and are surprised by the far-reaching impact the subprime crisis has had on markets throughout the world.

Understandably, the rating agencies have lost some confidence of the market for which I am very disappointed. I think it will be a long and difficult road to win back market confidence. We have, however, aggressively started down that road and believe that we are making progress, albeit slowly.

To win back investor confidence we simply must do a better job with our structured finance and other ratings. Our structured finance ratings must be more predictive and stable. Our research and analysis must be more insightful and forward-looking. We must tell the investor about what might happen tomorrow instead of what has happened yesterday. We of course remain committed to ensure that our work is of the highest integrity and objectivity.

89. On April 22, 2008, an article, entitled "Schumer Reveals Credit-Ratings Agencies Violated Own Conflict-Of-Interest Rules, Calls for Tighter SEC Oversight Of Firms," stated the following:

- 29 -

U.S. Senator Charles E. Schumer (D-NY) today pressed the head of the Securities and Exchange Commission to crack down on conflict-of-interest violations at the major credit-ratings agencies, which he said conspired to inflate an unsustainable credit bubble. Under questioning by Schumer before the Senate Banking Committee, SEC Chairman Christopher Cox disclosed that the firms disregarded their own internal controls meant to prevent the relationship between the firm and its clients from getting too close.

> "*There is ample evidence that the credit-rating agencies have embraced a set of practices that stoke conflict-of-interest issues,*" *Schumer said. "The agencies have refused to play by the rules, even those of their own making*. The SEC is in the process of exposing these conflicts; the next step is to prevent them from being repeated."

90.    Also on April 22, 2008, in his testimony concerning oversight of nationally recognized statistical rating organizations, SEC Chairman Christopher Cox stated the following:

> [O]ver the course of the past year, delinquency and foreclosure rates for subprime mortgage loans dramatically increased, throwing into turmoil the markets for securities collateralized by such loans, including subprime RMBS and CDOs backed by or referencing subprime RMBS. There is also general agreement that the high credit ratings on billions of dollars worth of RMBS and CDOs contributed to the increase in market acceptance of these structured finance products.

> As performance on subprime mortgage loans deteriorated, the credit rating agencies issued downgrades to their recent ratings of RMBS and CDOs, recognizing that the securities' likelihood of default had changed significantly for the worse. The rating agencies' performance in rating these structured credit products has called into question their credit ratings generally as well as the integrity of the ratings process as a whole. In an era of interconnected worldwide financial markets, the impact of the turmoil in subprime RMBS and CDOs has been widespread, adversely affecting the strength and stability of credit markets on a global scale.

*    *    *

> The first and most basic cause was the relaxation of loan underwriting standards. This occurred coincidentally with the growing practice of financial institutions using the credit risk transfer markets not just as a tool for managing risk, but as a way to generate substantial revenue. In consequence, the practice of packaging and selling mortgages as securities — which had been carried on by both government-sponsored enterprises and private originators — expanded greatly beginning in the early 2000s. At the same time, the complexity of such products and their collateral increased, driven by innovative products such as credit default swaps and CDOs designed to transfer credit risk from one party to another.

For financial institutions to use the credit risk transfer markets as a new source of substantial revenue, they had to find ways to sell RMBS and CDOs to a wide range of investors such as mutual funds, pension funds, hedge funds, banks, structured investment vehicles, and state government-operated funds. That meant getting these securities rated by the credit rating agencies, because many of these investors would purchase the securities only if they carried very high ratings.

Over time, increasingly higher-risk loans were packaged into these securities. This included loans underwritten with limited documentation to verify the borrower's income, and loans secured by second liens on the property. The trusts issuing these securities were structured so that the largest tranches could obtain a triple-A credit rating.

Ultimately, financial institutions began issuing synthetic CDOs composed of credit default swaps on RMBS, or hybrid CDOs made up of a combination of credit default swaps and actual RMBS. The issuers and underwriters for these securities also called upon the credit rating agencies to issue ratings that would enable them to be sold to investors.

The steady rise in housing prices from 2002 to 2006 ensured that the loans underlying these securities performed as well as, or even better than, projected by the credit rating agencies and other market participants. In the middle of 2007, however, conditions changed dramatically. As housing prices trended downward, delinquencies in subprime mortgages began to rise. This then, in part, caused the credit rating agencies to reevaluate their ratings of the subprime RMBS and CDOs. Ultimately, they downgraded many of their initial ratings.

Indeed, the number of credit rating downgrades of RMBS and CDOs is unprecedented:

*      *      *

• As of December 2007, Fitch had downgraded approximately 34% of the subprime tranches it rated in 2006 and in the first quarter of 2007. In February 2008, Fitch placed all of the RMBS it rated in 2006 and the first quarter of 2007 backed by subprime first lien mortgages on Ratings Watch Negative.

The downgrades of the RMBS necessarily led to downgrades of the CDOs collateralized or referencing the RMBS. This widespread downgrading of subprime-related securities contributed to the concern among market participants that the risk of owning these securities was much greater than originally thought. This concern was particularly acute among those investors who relied uncritically on the credit ratings in making investment decisions.

(Footnote omitted.)

- 31 -

91.     As a result of these disclosures, Fimalac's stock price declined over 5% in two trading days as artificial inflation came out of the stock price.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

92.     At all relevant times, the market for Fimalac's common stock was an efficient market for the following reasons, among other things:

(a)     Fimalac's stock met the requirements for listing, and was listed and actively traded on the Euronext Paris, a highly efficient and automated market; and

(b)     Fimalac regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

93.     As a result, the market for Fimalac's common stock promptly digested current information regarding Fimalac from all publicly available sources and reflected such information in Fimalac's stock price.  Under these circumstances, all purchasers of Fimalac common stock during the Class Period suffered similar injury through their purchase of Fimalac common stock at artificially inflated prices and a presumption of reliance applies.

## LOSS CAUSATION

94.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated Fimalac's stock price and operated as a fraud or deceit on Class Period purchasers of Fimalac stock by misrepresenting Fimalac's business success and future business prospects, including but not limited to misrepresentations regarding the growth and financial performance of Fitch, which, during the Class Period, was the driver of Fimalac's revenue growth and income generation.

- 32 -

95.     As a result of Defendants' fraudulent conduct as alleged herein, the price at which Fimalac stock traded was artificially inflated during the Class Period.  When Plaintiff and other members of the Class purchased their Fimalac stock, the true value of such stock was substantially lower than the prices actually paid by Plaintiff and the other members of the Class.

96.     During the Class Period, Defendants improperly concealed the true reasons behind the increases in Fimalac's financial performance and outlook, and, consequently, the price of its stock was artificially inflated throughout the Class Period.  Defendants also misrepresented the reasons behind Fimalac's reported results and made numerous false and misleading statements regarding many aspects of its business and future prospects.  Later, however, when the truth regarding Fimalac's true financial circumstances leaked out and Defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Fimalac's stock price fell precipitously as the prior artificial inflation came out of Fimalac's stock price.  As a result of their purchases of Fimalac stock during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under federal securities laws.

97.     By misrepresenting the success of Fitch's business and concealing its improprieties, Defendants presented a misleading picture of Fimalac's business and prospects.  These claims of future profitability caused and maintained the artificial inflation in Fimalac's stock price throughout the Class Period until the truth was partially revealed to the market.

98.     As a result of Defendants' materially false and misleading statements and documents, as well as the adverse, undisclosed information known to the Defendants, Plaintiff and other members of the Class relied, to their detriment, on such statements and documents, and/or the integrity of the market, in purchasing their Fimalac stock at artificially inflated prices during the

Class Period.  Had Plaintiff and the other members of the Class known the truth, they would not have taken such actions.

99.    As explained herein, these false statements directly or proximately caused, or were a substantial contributing cause of the damages and economic loss suffered by Plaintiff and other members of the Class, and maintained the artificial inflation in Fimalac's stock price throughout the Class Period and until the truth leaked into and was partially revealed to the market, at which time the prior inflation came out of the stock.

100.    Defendants' false and misleading statements had the intended effect and directly and proximately caused, or were a substantial contributing cause of Fimalac's stock trading at artificially inflated levels throughout the Class Period.

## NO SAFE HARBOR

101.    The federal statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Fimalac who knew that those statements were false when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not

disclose that Defendants were actually engaging in the very actions about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

102.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

103.    During the Class Period, Defendants, and each of them, carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did:  (i) deceive the investing public, Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Fimalac common stock; and (iii) cause Plaintiff and other members of the Class to purchase Fimalac common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took actions set forth herein.

104.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements made not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Fimalac stock in an effort to maintain artificially high market prices for Fimalac stock in violation of §10(b) of the Exchange Act and Rule 10b-5. Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.

105.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participating in the making of affirmative statements and reports, to the investing public, they each had a duty to promptly disseminate truthful

information that would be material to investors so that the market price of Fimalac common stock would be based on truthful, complete and accurate information.

106.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, business practices, performance, product marketing and promotion, operations and future prospects of the corporate defendants as specified herein.

107.    Defendants each employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Fimalac's value and performance and continued substantial sales, financial and operational growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state necessary facts in order to make the statements made about Fimalac and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of Fimalac stock during the Class Period.

108.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts:  (a) each of the Individual Defendants was a high-level executive at a corporate defendant during the Class Period; (b) each of the Individual Defendants, by virtue of his responsibilities and activities as a senior executive officer and/or director of Fimalac or Fitch, was privy to and participated in the creation, development and reporting of Fimalac's internal sales and marketing plans, projections and/or reports; and (c) each of the Individual Defendants was aware of

Fitch's dissemination of information to the investing public which each knew, or disregarded with severe recklessness, was materially false and misleading.

109.    Each of these Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with severely reckless disregard for the truth in that each failed to ascertain and to disclose such facts, even though such facts were available to each of them.  Such Defendants' material misrepresentations and/or omissions were done knowingly or with severe recklessness and for the purpose and effect of concealing the corporate defendants' operating condition, sales, product marketing and promotional practices and future business prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' misstatements of the corporate defendants' financial condition and performance throughout the Class Period, each of the Individual Defendants, if he did not have actual knowledge of the misrepresentations and omissions alleged, was severely reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false and misleading.

110.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Fimalac stock was artificially inflated during the Class Period.  In ignorance of the fact that market price of Fimalac common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to or disregarded with severe recklessness by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Fimalac stock during the Class Period

at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines when the artificial inflation was released from Fimalac stock.

111.    At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known of the true performance, marketing, promotion and other fraudulent business practices, future prospects and intrinsic value of Fimalac, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Fimalac common stock during the Class Period, or they would not have done so at the artificially inflated prices which they paid.

112.    By virtue of the foregoing, Defendants have each violated §10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

113.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of Fimalac stock during the Class Period, as evidenced by, *inter alia,* the stock price declines when the artificial inflation was released from Fimalac stock.

## COUNT II

### For Violations of §20(a) of the Exchange Act
### Against Defendants Fimalac, Fitch Group, Lacharrière, Joynt and Schiavetta

114.    Plaintiff repeats and realleges the allegations set forth above as though fully set forth herein.  This claim is asserted against defendants Fimalac, Fitch Group, Lacharrière, Joynt and Schiavetta (the "§20(a) Defendants").

115.    Defendants Fimalac, Fitch Group, Lacharrière, Joynt and Schiavetta acted as controlling persons of Fitch pursuant to §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with Fimalac or Fitch, participation in and/or awareness of Fitch's

- 38 -

operations and/or intimate knowledge of the corporate defendants' fraudulent marketing and promotions and actual performance, each of the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Fitch, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Each of the Defendants was provided with or had unlimited access to copies of the statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

116.    In addition, each of the Individual Defendants had direct involvement in the day-to-day operations of Fitch and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised the same.

117.    Fimalac was a control person of Fitch Group and Fitch by virtue of its ownership of 80% of Fitch Group. Fitch Group was a control person of Fitch by virtue of its 100% ownership of Fitch.

118.    As set forth above, Defendants each violated §10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, each of the §20(a) Defendants is liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of Fimalac stock during the Class Period, as evidenced by the stock price declines when the artificial inflation was released from Fimalac stock.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that this action is a proper class action and designating Plaintiff as class representatives under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands trial by jury.

DATED:  July 1, 2008                    COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP
                                        SAMUEL H. RUDMAN


                                               /S/ Samuel H. Rudman
                                        _____
                                            SAMUEL H. RUDMAN

                                        58 South Service Road, Suite 200
                                        Melville, NY  11747
                                        Telephone:  631/367-7100
                                        631/367-1173 (fax)

                                        COUGHLIN STOIA GELLER
                                          RUDMAN & ROBBINS LLP
                                        DARREN J. ROBBINS
                                        MATTHEW P. MONTGOMERY
                                        655 West Broadway, Suite 1900
                                        San Diego, CA  92101
                                        Telephone:  619/231-1058
                                        619/231-7423 (fax)

                                        Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
PURSUANT TO FEDERAL SECURITIES LAWS

INDIANA LABORERS PENSION FUND ("Plaintiff") declares:

1.      Plaintiff has reviewed a complaint and authorized its filing.

2.      Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.      Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.      Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*Indiana State District Council of Laborers and HOD Carriers Pension and Welfare Fund v. Omnicare, Inc., et al.*, No. 2:06-cv-00026-WOB (E.D. Ky.)

6.      The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

    I declare under penalty of perjury that the foregoing is true and correct. Executed this _30_ day of _June_ , 2008.

INDIANA LABORERS PENSION FUND

By: _____

Its:   Secretary-Treasurer

- 2 -

FIMALAC

## SCHEDULE A

### SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---|---|---|
| 11/10/2006 | 7,810 | € 71.75 |
| 04/26/2007 | 9,830 | € 78.86 |
| 03/12/2008 | 5,460 | € 38.29 |